**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ORAL HILLARY,**

                           **Plaintiff,**              **7:12-cv-1669**
                                                       **(GLS/DEP)**

            **v.**

**VILLAGE OF POTSDAM et al.,**

                           **Defendants.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Mani C. Tafari              MANI C. TAFARI, ESQ.
P.O. Box 135
Locust Valley, NY 11560

**FOR THE DEFENDANTS:**
Burke, Scolamiero Law Firm           THOMAS J. MORTATI, ESQ.
7 Washington Square
Albany, NY 12212

**Gary L. Sharpe**
**Chief Judge**

## <u>MEMORANDUM-DECISION AND ORDER</u>

### I. <u>Introduction</u>

Plaintiff Oral Hillary commenced this action against defendants

Edward Tischler, Mark Murray, Charlie Daniels, Michael Ames, and

unnamed John Does, all individually and in their official capacities, and the

Village of Potsdam, alleging violations of the Fourth, Sixth, and Fourteenth Amendments, and New York state law for false imprisonment, intentional infliction of emotional distress, assault and battery, defamation, and negligent hiring. (Am. Compl., Dkt. No. 23.) Pending before the court are motions for summary judgment filed by both Hillary, (Dkt. No. 59), and defendants, (Dkt. No. 60), as well as a motion by Hillary to unseal the summary judgment motions, which were originally filed with this court under seal, (Dkt. No. 73). For the reasons that follow, Hillary's motion for partial summary judgment[1] is denied, defendants' motion for summary judgment is granted in part and denied in part, and Hillary's motion to unseal is denied.

## II. __Background__[2]

This lawsuit arises out of the Village of Potsdam Police Department's investigation into the October 24, 2011 death of Garrett Phillips, which, following an autopsy, was ruled a homicide. (Defs.' Statement of Material

---

[1] While defendants seek dismissal of all claims against them in their motion for summary judgment, (Dkt. No. 60, Attach. 46), in his motion for summary judgment, Hillary has only moved for summary judgment on liability with respect to some of his claims, and does not appear to seek summary judgment on his Sixth Amendment, Fourteenth Amendment, and defamation claims, (Dkt. No. 59, Attach. 3).

[2] Unless otherwise noted, the facts are not in dispute.

Facts (SMF) ¶¶ 1-3, Dkt. No. 60, Attach. 45.)  Phillips was initially found unresponsive in his home on October 24 at approximately 5:30 P.M.  (*Id.* ¶ 1.)  Hillary, who at the time was the head men's soccer coach at Clarkson University, (Pl.'s SMF ¶ 2, Dkt. No. 59, Attach. 2), had been in a relationship with Phillips' mother, Tandy Cyrus, at some point in the year immediately preceding Phillips' death.  (Defs.' SMF ¶¶ 5-7.)

Two days later, on the morning of October 26, Murray, a lieutenant with the Potsdam police, went to Hillary's home and asked him to come to the police station.  (Defs.' SMF ¶ 20; Pl.'s SMF ¶¶ 3, 20.)  At Murray's request, Hillary drove himself to the police station on October 26, and, upon arriving, at approximately 8:00 A.M., he was taken to Murray's office.  (Defs.' SMF ¶ 21; Pl.'s SMF ¶¶ 21-22.)  At some point after arriving, Hillary indicated to Tischler, the chief of police, that he would have to leave to go to work, but Hillary was told that he was not free to leave the station.  (Defs.' SMF ¶ 23; Pl.'s SMF ¶ 23.)  At the time, defendants had obtained neither an arrest warrant nor a search warrant for Hillary, (Pl.'s SMF ¶¶ 25-26), although during the time Hillary was held at the Potsdam Police Department, Murray applied for and obtained a search warrant authorizing a search of Hillary's person, (Defs.' SMF ¶ 27; Dkt. No. 60, Attach. 32).

At some point over the course of the day, while Hillary was still at the police station, defendants took possession of Hillary's mobile telephone and car. (Pl.'s SMF ¶¶ 27, 29.) Although defendants ultimately obtained search warrants for Hillary's telephone and vehicle, (Defs.' SMF ¶¶ 30, 32; Dkt. No. 60, Attachs. 34, 35), at the time these items were taken, defendants did not yet have search warrants for them. (Pl.'s SMF ¶¶ 28, 30.) Ultimately, Hillary was permitted to leave the police station some time in the evening of October 26. (Defs.' SMF ¶ 29.)

The second incident that gives rise to Hillary's claims here occurred the next month, in November 2011. On November 28, the Potsdam police obtained a search warrant authorizing a search of Hillary's residence. (*Id.* ¶ 34; Dkt. No. 60, Attach. 36.) On November 30, Murray and Daniels went to Hillary's residence in order to execute that search warrant. (Pl.'s SMF ¶ 40; Defs.' SMF ¶ 39.) At the time, Hillary was at home with his two-year-old son, around whose torso Daniels "placed his hands . . . in order to remove the child from [Hillary]'s grasp." (Pl.'s SMF ¶¶ 41-42.)

At the time the pending summary judgment motions were filed, no criminal charges had yet been brought against Hillary in conjunction with Phillips' death, and the investigation into the death remained ongoing. (*Id.*

4

¶ 43; Defs.' SMF ¶¶ 44-45.)  Hillary subsequently commenced this suit, alleging several claims arising from his detention and the seizure of his personal effects in October 2011, and the subsequent incident at his home in November 2011.  (*See generally* Am. Compl.)  Hillary has since been indicted by a grand jury in connection with the murder of Phillips, and the criminal charges against him remain pending.  (Dkt. No. 82.)

### III.  Standards of Review

### A.    Motion to Unseal

"[T]he decision whether or not to grant access [to sealed documents] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."  *United States v. Longueuil*, 567 F. App'x 13, 15 (2d Cir. 2014) (internal quotation marks and citation omitted).  In evaluating a claim of access to sealed documents, a court considers: "(1) whether the documents to which access is sought constitute 'judicial documents' giving rise to a presumption of access; (2) if so, the weight accorded the presumption; (3) the existence of any countervailing factors militating against public access; and (4) whether the presumption of access outweighs the countervailing factors."  *In re Sealed Search Warrants*

*Issued June 4 & 5, 2008*, No. 08-M-208, 2008 WL 5667021, at *2 (N.D.N.Y. July 14, 2008) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-26 (2d Cir. 2006)).  It is the burden of the party seeking to overcome the presumption of access to demonstrate the need to keep the materials under seal.  *See DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

**B.**    **Summary Judgment**

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. Discussion

**A.**    **Motion to Unseal**

The court begins this discussion with a brief procedural history of the sealing of the summary judgment motions in this case.  As discussed above, this case arises out of a criminal homicide investigation conducted by members of the Potsdam Police Department.  (*See generally* Am. Compl.)  That investigation remains ongoing.  (Dkt. No. 74 ¶ 4; Dkt. No. 74,

6

Attach. 2 ¶ 4; Dkt. No. 80 at 2.)  Early in the litigation, the parties entered into a Confidentiality Stipulation and Order to facilitate discovery while also protecting "privileged information in the defendants' possession relative to a criminal investigation."  (Dkt. No. 12 at 1.)  Pursuant to the stipulation, defendants were given the right to designate as "'Confidential' . . . any information, document or thing" exchanged between the parties in discovery which involves the underlying homicide investigation, "such that release of such information poses a threat to the integrity of or compromise of such investigation or which revelation might compromise law enforcement techniques or methods."  (*Id.* ¶ 1(a).)

On May 21, 2013, Magistrate Judge David E. Peebles approved the parties' stipulation and entered a corresponding protective order.  (Dkt. No. 13.)  On March 31, 2014, both parties filed their motions for summary judgment.  (Dkt. Nos. 59, 60.)  Each party requested that its motion, along with accompanying papers and exhibits, be filed under seal due to the confidential nature of the information contained therein, (Dkt. Nos. 55, 58), and these requests were granted by the court, (Dkt. Nos. 56, 57).  Hillary now seeks to unseal the motions.  (Dkt. No. 73.)

In support of his motion to unseal, Hillary argues that, because he

has since been formally charged with the underlying homicide, "there is no longer a sufficient reason to prevent the media and the public from accessing the information," and, further, that defendants have disclosed confidential information to the public, thus "undermining their basis for the sealing." (Dkt. No. 73, Attach. 1 at 1-6.) In opposing the motion to unseal, defendants argue that the sealed documents here fall within several exceptions to the public's right of access, including concerns of law enforcement efforts, judicial efficiency, and privacy interests. (Dkt. No. 74, Attach. 3 at 1-4.) Further, they assert that the investigation into the homicide remains ongoing, and that they have not disclosed confidential information publically, such that the motions and attached exhibits should remain sealed. (*Id.* at 4-9.) For the reasons that follow, the court agrees with defendants and the motion to unseal is denied at this juncture.

"[D]ocuments submitted to a court in support of or in opposition to a motion for summary judgment are judicial documents to which a presumption of immediate public access attaches under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 126. However, the rights of access are not absolute, and may be rebutted by countervailing factors that outweigh public interests. *See id.* at 124. Regardless of

8

whether competing interests are categorized as common law countervailing factors or First Amendment higher values, defendants must demonstrate that those interests outweigh public disclosure. *See id.*; *United States v. Amodeo*, 71 F.3d 1044, 1047-48 (2d Cir. 1995) ("*Amodeo II*"); *United States v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995) ("*Amodeo I*"). While courts sometimes reference these interests generically when analyzing common law or First Amendment access, the decisions are rarely made in a factual vacuum. Nonetheless, some law enforcement interests are routinely accepted as higher values and countervailing factors, including: the protection of law enforcement techniques and procedures; the protection of the confidentiality of sources; the safety of witnesses and police officers; the privacy and reputation interests of those involved in an investigation, including victims, witnesses and potential targets; the protection of ongoing investigations in terms of preventing interference, flight, or other obstructionist activities; and the protection of grand jury secrecy. *See United States v. Aref*, 533 F.3d 72, 82-83 (2d Cir. 2008); *Lugosch*, 435 F.3d at 120; *In re Grand Jury Subpoena*, 103 F.3d 234, 237 (2d Cir. 1996); *Amodeo II*, 71 F.3d at 1050; *Amodeo I*, 44 F.3d at 146-47; *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir.

1988); *United States v. Haller*, 837 F.2d 84, 87-89 (2d Cir. 1988).

Thus, "[t]he [c]ourt's task is to 'balance competing considerations'—including but not limited to 'the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure'—against the presumption in favor of public access." *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 256 (S.D.N.Y. 2014) (quoting *Lugosch*, 435 F.3d at 120), *aff'd*, 578 F. App'x 24 (2d Cir. 2014). The Second Circuit has recognized the law enforcement privilege as an interest worthy of protection. *See In re Dep't of Investigation*, 856 F.2d at 484. This privilege is designed "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Id.* at 484.

As mentioned above, Hillary's primary argument in favor of unsealing is his belief that law enforcement considerations no longer justify sealing, as he has been indicted for the crime, and thus, the investigation is no longer "ongoing." (Dkt. No. 73, Attach. 1 at 2-4.) Similarly, he argues that "the purpose behind denying access to the [s]ummary [j]udgment [m]otions

10

is . . . moot" because the information obtained during the investigation "will be heard . . . during the course of the criminal proceeding." (*Id.* at 4.) However, defendants have attested to the fact that the investigation remains open and ongoing. (Dkt. No. 74, Attach. 2 ¶ 4); *see Amodeo I*, 44 F.3d at 147 ("Both the claims of law enforcement privilege and privacy are proper concerns for a trial court in performing the balancing test required to determine whether access should be allowed or denied."); *In re Sealed Search Warrants Issued June 4 & 5, 2008*, 2008 WL 5667021, at *4 ("Where, as here, the investigation will result in the filing of charges or the determination not to do so, the interest in the integrity and security of that investigation outweighs the interest in immediate access to the documents, particularly where future disclosure of the documents is likely.") Defendants further argue that they seek to keep the documents under seal in order "to protect [Hillary's] rights to a fair trial," (Dkt. No. 74, Attach. 3 at 2), to prevent contamination of a potential jury pool, (Dkt. No. 74, Attach. 1 ¶ 9), and out of privacy concerns for third parties, including the minor victim, (Dkt. No. 74, Attach. 3 at 2-3). *See In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) ("Certainly, the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure . .

. should weigh heavily in a court's balancing equation.").

Here, although the sealed documents, submitted in conjunction with summary judgment motions, are subject to a presumption of public access, the court is satisfied, upon review of the motion papers and attached exhibits, that the documents subject to the protective order were properly placed under seal, as they reflect sensitive information about an ongoing investigation and the Potsdam Police Department's investigative methods and techniques. *See In re Dep't of Investigation*, 856 F.2d at 484; *In re Sealed Search Warrants Issued June 4 & 5, 2008*, 2008 WL 5667021, at *4 ("At this stage, the public has at least as great an interest in preserving the integrity and security of criminal investigations as in obtaining access to judicial documents."). Notably, Hillary does not purport to argue that the documents were improperly placed under seal, or that the information contained in them is not confidential, as he acknowledged in his request to seal that the motion exhibits "contain confidential information." (Dkt. No. 58.) Instead, he simply asserts his view that the investigation is no longer ongoing. (Dkt. No. 73, Attach. 1 at 4.) Defendants directly refute this contention with sworn affidavits. (Dkt. No. 74, Attach. 1 ¶¶ 7-11; Dkt. No. 74, Attach. 2 ¶ 4.) Accordingly, the balance of interests weighs in favor of

continued sealing, and Hillary's motion to unseal is denied at this juncture.[3]

*See Longueuil*, 567 F. App'x at 16 (affirming district court's decision to maintain documents under seal where documents discussed an ongoing law enforcement investigation, and where party seeking disclosure had consented to a protective order with respect to those documents).  The court now turns to the merits of the parties' competing summary judgment motions.

## B.    <u>Summary Judgment Motions</u>[4]

---

[3] Hillary further argues that continued sealing is not merited because defendants have chosen to publicly reveal bits of information from the civil case, such that the entirety of the summary judgment motions should be unsealed.  (Dkt. No. 73, Attach. 1 at 4-6.)  It is true that "a court lacks power to seal information that, although once sealed, has been publicly revealed."  *In re Application to Unseal 98 Cr. 1101(ILG)*, 891 F. Supp. 2d 296, 300 (E.D.N.Y. 2012) (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004)).  Here, Hillary points to media reports in which Mary Rain, the St. Lawrence County District Attorney, indicated that Hillary was a "habitual marijuana smoker," and further reports indicating that "[t]hose with knowledge of the investigation" told the media that Hillary's daughter provided him with an alibi early in the investigation.  (Dkt. No. 73, Attach. 1 at 5.)  From this, Hillary simply concludes, without any evidentiary support, that defendants must have disclosed such information to the public.  (*Id.* at 5-6.)  However, the court is not persuaded that these limited disclosures, which Hillary cannot connect to defendants with anything more than mere speculation, justify the unsealing of the entirety of the parties' summary judgment motions and attached exhibits, as Hillary seeks.

[4] At the outset, the court notes that Hillary has offered no opposition to defendants' arguments for dismissal on several of his claims, and the court thus deems these claims abandoned and dismissed.  *See Gaudette v. Saint-Gobain Performance Plastics Corp.*, No. 1:11-cv-932, 2014 WL 1311530, at *16 (N.D.N.Y. Mar. 28, 2014) (explaining that a court may deem a claim abandoned when a party moves for summary judgment on one ground and the nonmoving party fails to address that argument).  First, defendants argue that all claims against the individual defendants in their official capacities should be dismissed because such claims "'are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant.'"  (Dkt. No. 60, Attach. 46 at 6 (quoting *Wallikas v. Harder*, 67 F. Supp. 2d 82, 83 (N.D.N.Y. 1999).)  As noted by defendants, Hillary failed to respond to this argument in opposition to their summary judgment motion.  (Dkt. No. 65 at 10.)

### 1. Fourth Amendment and False Imprisonment[5]

With respect to Hillary's false imprisonment cause of action, defendants argue that it must be dismissed because there was probable cause for Hillary's detention and/or arrest.  (Dkt. No. 60, Attach. 46 at 6-10.)  In response, Hillary asserts that there are questions of fact which preclude summary judgment on this claim.  (Dkt. No. 62, Attach. 9 at 5-13.)

_____

Therefore, defendants are entitled to summary judgment on this basis, and all claims against the individual defendants in their official capacities are dismissed.

Similarly, defendants seek summary judgment on Hillary's Sixth Amendment claim, arguing that, in light of his admission that no charges were filed against him at the time of his detention, (Defs.' SMF ¶ 44; Am. Compl. ¶ 38), no Sixth Amendment right to be informed of the nature of the accusations against him had yet attached.  (Dkt. No. 60, Attach. 46 at 17); *see Martin v. Cnty. of Nassau*, 692 F. Supp. 2d 282, 294 (E.D.N.Y. 2010) ("[S]everal district courts in this Circuit have held that an arresting officer need not inform an arrestee of the charges against him.").  Hillary has offered no opposition to this argument, and the court thus considers this claim abandoned.

Lastly, as to Hillary's cause of action for violations of the New York State Constitution, (Am. Compl. ¶¶ 66-68), defendants argue that it should be dismissed because Hillary "has an adequate federal remedy for violation of h[is] state constitutional rights," *Malay v. City of Syracuse*, 638 F. Supp. 2d 303, 316 (N.D.N.Y. 2009).  (Dkt. No. 60, Attach. 46 at 20.)  Hillary has offered no response to this argument; accordingly, his state constitutional claims are dismissed as abandoned.

[5]  Hillary has asserted two duplicative causes of action, one labeled "false arrest" and one labeled "false imprisonment," both premised on his October 26, 2011 detention.  (Am. Compl. ¶¶ 47-54, 55-62.)  The correct nomenclature is "false imprisonment" because Hillary maintains that he was arrested without a warrant and, therefore, without process.  (Pl.'s SMF ¶ 25); *see Wallace v. Kato*, 549 U.S. 384, 388-89 (2007); *McClellan v. Smith*, No. 1:02-CV-1141, 2009 WL 3587431, at *1 n.1 (N.D.N.Y. Oct. 26, 2009).  He also appears to assert a similar claim pursuant to the Fourth Amendment.  (Am. Compl. ¶ 64.a.)  In general, the torts of false arrest and false imprisonment under 42 U.S.C. § 1983 and New York State law are "substantially the same" except for "the requirement that the constitutional tort be under color of state law."  *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (internal quotation marks and citation omitted); *see Jacques v. Sears, Roebuck & Co.*, 30 N.Y.2d 466, 473 (1972).  A claim for false arrest or imprisonment brought pursuant to § 1983 "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted).  Accordingly, the court will refer to these three causes of action together as "false imprisonment."

The parties have made similar arguments in connection with Hillary's motion for summary judgment.  (Dkt. No. 59, Attach. 3 at 8-21; Dkt. No. 63, Attach. 42 at 4-10.)  In short, questions of fact render the entry of summary judgment on this claim inappropriate at this juncture.[6]

To establish a false imprisonment claim under New York law, a plaintiff must demonstrate that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citations omitted).  The existence of probable cause is an absolute defense to a false imprisonment claim. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  An officer has probable cause to arrest when he or she has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Id.*; *see Dunaway v.*

_____

[6] Defendants posit an argument that Hillary's constitutional claims should be dismissed for failure to specifically cite to 42 U.S.C. § 1983 in his amended complaint.  (Dkt. No. 60, Attach. 46 at 11.)  This argument may be summarily rejected, as "Rule 8's 'liberal pleading principles' do not permit dismissal for failure in a complaint to cite a statute, or to cite the correct one . . . .  Factual allegations alone are what matters."  *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) (internal quotation marks and citation omitted).

*New York*, 442 U.S. 200, 208 n.9 (1979); *Jaegly v. Couch*, 439 F.3d 149, 152-53 (2d Cir. 2006) ("[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  Even if probable cause is lacking, an officer will be entitled to qualified immunity if there was "arguable" probable cause for the arrest—that is, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (internal quotation marks and citation omitted).

Here, the bulk of the parties' arguments revolve around whether or not defendants had probable cause to arrest and/or detain Hillary on the morning of October 26, and, thus, whether his "confinement was . . . privileged."  *Singer*, 63 F.3d at 118.  The parties do not appear to dispute any of the remaining elements of the cause of action; although defendants assert, without further explanation, that "[Hillary] was never formally placed under arrest or charged," they do not dispute that they did not have an arrest warrant, and that, at some point, Hillary was prohibited from leaving

the station.  (Dkt. No. 60, Attach. 46 at 6; Pl.'s SMF ¶¶ 23, 25; Defs.' SMF

¶ 23.)  Instead, they argue that the confinement was privileged because

they had probable cause to arrest Hillary.  (Dkt. No. 60, Attach. 46 at 6-10.)

As support, defendants rely almost entirely on the application for the

search warrant of Hillary's person, which was purportedly obtained at 3:46

P.M. on October 26.  (*Id.* at 8-9; Dkt. No. 60, Attach. 32 at 1.)  Defendants

note that the information contained in the warrant application was "largely

the same information [defendants] had when [Hillary] was detained."  (Dkt.

No. 60, Attach. 46 at 8.)  However, questions of fact render summary

judgment for either side inappropriate at this juncture.[7]  As an initial matter,

the parties appear to dispute exactly what time Hillary was prevented from

leaving the police station, and thus when the "seizure" began.  *See United

States v. Gori*, 230 F.3d 44, 49 (2d Cir. 2000) ("A person can be seized

without being physically restrained where 'in view of all of the

circumstances surrounding the incident, a reasonable person would have

---

[7] Although, upon review of the parties' arguments and the evidentiary record in this case, there are arguments that are apparent to the court that the parties could have made with respect to the justification or lack thereof for Hillary's detention, the court has limited its discussion to the arguments actually raised and advocated by the parties here, and has not endeavored to address arguments not made.

believed that he was not free to leave.'" (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Critically, while Hillary indicated that he was "barred from leaving . . . shortly after 9:00 in the morning," (Dkt. No. 63, Attach. 3 at 5), Murray testified that Hillary entered his office at 8:22 A.M., they spoke "for approximately an hour and a half, not two hours," and at that point, presumably closer to 10:00 A.M., Hillary "was informed he was going to be detained," (Dkt. No. 63, Attach. 23 at 20).  The resolution of this disputed fact is crucial to any analysis of probable cause—or arguable probable cause, in the qualified immunity context—because, as is well established, the existence of probable cause hinges on the information known to defendants at the time of the detention.  *See Jaegly*, 439 F.3d at 152-53.  Given this disputed fact, and despite defendants' assertion that "[t]he information contained in the warrant application for the search of Hillary's person largely reflects information the Potsdam Police Department had when [Hillary] was detained," (Dkt. No. 60, Attach. 37 ¶ 14), there also exists a question of fact as to what information was known to defendants at the time they detained Hillary.[8]  Notably, some of the supporting

_____

[8] Also in light of the questions of fact highlighted here, the court declines to dismiss the remaining claims against defendants on the basis of qualified immunity.  (Dkt. No. 60, Attach. 46 at 4-5.)  It is unclear to the court how defendants' cooperation with other law enforcement agencies in the underlying homicide investigation, "alone[,] demonstrates that officers of

depositions attached to the warrant application would appear to indicate that they may have been obtained after the "arrest" occurred, and therefore were not known to defendants at the time of the detention. (Dkt. No. 60, Attach. 32 at 4-37.)

Thus, granting summary judgment on this basis would be inappropriate, as the court is left without an undisputed account of exactly what information defendants had at the time Hillary was "seized." In other words, these questions of fact prevent the court from making a determination as to whether or not, at the time they detained him, defendants had probable cause to suspect that Hillary had committed a crime, and therefore preclude the entry of summary judgment for either party on Hillary's false imprisonment claim. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 88 (2d Cir. 2007).

Similarly, with respect to Hillary's claims for illegal seizure of his personal property in violation of the Fourth Amendment, defendants argue

---

reasonable competence felt defendants' actions were both reasonable and supported by probable cause." (*Id*. at 5.) Here, the matter of whether it was reasonable for the officers to believe their actions met the standards set by the legal principles governing their conduct depends on the resolution of disputed facts, and the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law at this juncture. *See Weyant*, 101 F.3d at 857-58.

that the seizures were justified by the same probable cause that justified his initial detention, and that exigent circumstances and/or the search incident to lawful arrest exceptions excused them from obtaining warrants prior to seizing Hillary's belongings. (Dkt. No. 60, Attach. 46 at 12-16.) For primarily the reasons discussed above, namely the questions of fact surrounding the issue of probable cause, summary judgment to either party is inappropriate at this juncture.

"In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 700-01 (1983). Defendants argue that "seizure of property without a warrant . . . is permitted under the Fourth Amendment 'pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.'" (Dkt. No. 60, Attach. 46 at 13-14 (quoting *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998).) However, defendants must also establish that "law enforcement authorities have probable cause to believe that [property] holds contraband or

evidence of a crime." *Martin*, 157 F.3d at 53 (internal quotation marks and citations omitted). Here, given the existence of genuine disputes of material fact going to the underlying probable cause determination, specifically the timing of the seizures of Hillary's property and the knowledge of law enforcement at those particular times, defendants' argument that exigent circumstances justified seizing Hillary's property without a warrant is unavailing. *See United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987) ("Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure *for which probable cause exists*, unless they act swiftly, even though they have not obtained prior judicial authorization." (emphasis added)).

Similarly, defendants, assuming that probable cause was present here, argue that "[t]he search and seizure of property incident to an arrest supported by probable cause is a reasonable search pursuant to the Fourth Amendment." (Dkt. No. 60, Attach. 46 at 15 (citing *United States v. Davenport*, 303 F. App'x 42, 44 (2d Cir. 2008).) However, given the outstanding disputes regarding whether the initial arrest was supported by probable cause, the same disputes prevent the court from determining, on

summary judgment, whether the search/seizure of Hillary's property was done incident to a lawful arrest.

### 2. *Municipal Liability*

In conjunction with their arguments for dismissal of Hillary's constitutional claims, defendants simply assert, without further argument, that Hillary "has not pled nor alleged any violative policy or custom," and therefore his claims against the Village of Potsdam are "facially invalid and must be dismissed."  (Dkt. No. 60, Attach. 46 at 12.)  In response, Hillary argues that the Village, as a municipality, may be held liable based on the involvement of Tischler, who is a "government official with final-decision making authority as to the actions of the Potsdam Police Department." (Dkt. No. 62, Attach. 9 at 18-19.)  For the following reasons, at this juncture, summary judgment is denied on the issue of municipal liability.

To establish municipal liability for constitutional violations, a plaintiff must "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Zherka v. City of N.Y.*, 459 F. App'x 10, 12 (2d Cir. 2012) (internal quotation marks and citation omitted).  To do so, a plaintiff may allege: "(1) that the [municipality]'s failure to train its employees amounted to deliberate

indifference to constitutional rights; (2) that there was a persistent and widespread unconstitutional governmental policy or custom; or (3) that a [municipal] policymaker approved any constitutional violation." *Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014) (citations omitted). Moreover, while this rule "does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (citations omitted).

However, as Hillary argues, (Dkt. No. 59, Attach. 3 at 23-24), and defendants acknowledge, (Dkt. No. 63, Attach. 42 at 14-15), a single decision by a municipal policymaker may suffice to subject a municipality to liability under § 1983. *See Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986)). "Where a municipal official 'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Griffin v. Vill. of Frankfort*, No. 10-CV-627, 2012 WL 4491276, at *4 (N.D.N.Y. Sept. 28, 2012) (quoting *Gronowski v. Spencer*,

23

424 F.3d 285, 296 (2d Cir. 2005)); *see Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406 (1997) ("[A] final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983." (internal quotation marks and citation omitted)).

Here, Hillary's § 1983 claim against the Village survives, premised on the surviving Fourth Amendment claims discussed above. Defendants seek dismissal of the constitutional claims against the Village on the basis that Hillary has neither alleged nor demonstrated a "violative policy or custom." (Dkt. No. 60, Attach. 46 at 12.) They argue that a plaintiff must "'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" (Dkt. No. 63, Attach. 42 at 15 (quoting *Zherka*, 412 F. App'x at 348).) Thus, they argue that Tischler, as the alleged municipal policymaker, is not connected to any of the alleged violations because he testified that he did not instruct anyone to take Hillary's telephone. (*Id.*) However, Hillary has provided and pointed to evidence that Tischler was a policymaker with respect to police investigations, in that he was responsible for the department, specifically

the training of officers, (Dkt. No. 60, Attach. 26 at 7), and responsible for this particular investigation, (*id.* at 10). *See Roe*, 542 F.3d at 37 ("[T]he critical inquiry is . . . whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."); *Griffin*, 2012 WL 4491276, at *4 (finding that a village police chief was a municipal policymaker, such that his alleged conduct of violating the plaintiff's constitutional rights, and ordering officers to do so, could subject municipality to liability under § 1983).

Further, there is a question of fact as to the extent of Tischler's involvement in the alleged constitutional violations. Although Tischler testified that he did not instruct anyone to take Hillary's mobile telephone, (Dkt. No. 60, Attach. 26 at 14-15), Hillary testified that Tischler gave the command to other officers to take the telephone, (Dkt. No. 60, Attach. 23 at 41), and defendants admit that Tischler told Hillary he could not leave the station, (Pl.'s SMF ¶ 23; Dkt. No. 63, Attach. 24 at 2). Thus, given the questions of fact present here, there is enough, at this juncture, for Hillary's claim of municipal liability to survive summary judgment.

3.    *Fourteenth Amendment*

Defendants next argue that Hillary's Fourteenth Amendment due

process claim is duplicative of his other claims, and that a "generalized notion of substantive due process" may not be asserted where alleged conduct is prohibited by another constitutional amendment.[9] (Dkt. No. 60, Attach. 46 at 17 (internal quotation marks and citation omitted).) Further, defendants assert that any equal protection claim requires Hillary to prove "'purposeful discrimination directed at an identifiable or suspect class.'" (*Id.* at 19 (quoting *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999).) In response, Hillary simply states, in conclusory fashion, that he has established an equal protection claim, seemingly because "[d]efendants targeted [him] almost immediately after the homicide." (Dkt. No. 62, Attach. 9 at 18.) Yet, he provides no basis on which he was targeted, either in his amended complaint or in response to defendants' motion, simply stating that the "disparate treatment of [him] in comparison to the other ex-boyfriends of Ms. Cyrus is shocking." (*Id.*) Simply put, these conclusory assertions, without more, are insufficient to establish an equal protection claim. *See Hamzik v. Office for People with*

---

[9] In his response to defendants' motion, Hillary has only briefly addressed defendants' arguments on this point, stating that he "has sufficiently established an equal protection claim", with no mention of "due process." (Dkt. No. 62, Attach. 9 at 18.) To the extent Hillary's complaint asserts a claim for a violation of due process, he has made no argument as to the basis for such a claim, and that claim is therefore considered abandoned, and dismissed.

*Developmental Disabilities*, 859 F. Supp. 2d 265, 280 (N.D.N.Y. 2012).

This claim is therefore dismissed.

### 4. Assault and Battery; Negligence

As to Hillary's claims for both assault and battery and negligence, defendants argue that they are entitled to dismissal of these claims for Hillary's failure to include them in his notice of claim. (Dkt. No. 60, Attach. 46 at 33-34.) Hillary responded to this argument—in connection with his assault and battery claim only—arguing that, because he pleaded an assault and battery claim in his complaint, this gave defendants adequate notice of this cause of action. (Dkt. No. 62, Attach. 9 at 21.) For the following reasons, the court finds defendants' argument persuasive, and dismisses both the assault and battery and negligence causes of action.

Under New York law, the service of a notice of claim is a condition precedent to the commencement of a tort action against a municipality or its agents, officers, or employees. *See* N.Y. Gen. Mun. Law §§ 50-e, 50-i. "Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793-94 (2d Cir. 1999) (internal quotation marks

and citations omitted).  The notice of claim must "include[ ] information sufficient to enable the [municipality] to investigate" the plaintiff's claims, *Parise v. N.Y.C. Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009), as well as "the nature of the claim" and "the time when, the place where and the manner in which the claim arose," N.Y. Gen. Mun. Law § 50-e(2).

Here, the notice of claim submitted by Hillary alleges claims for "[f]alse [a]rrest," "[i]llegal [d]etention," "illegal search and seizure," "emotional distress," and "defamation."  (Dkt. No. 60, Attach. 2 at 1.)  It states that the claims "occurred on or about October 26," when Hillary "was detained."  (*Id.*)  Notably, there is no mention of claims for assault and battery or negligence, nor is there any indication of "the manner in which [such] claim[s] arose."  N.Y. Gen. Mun. Law § 50-e(2).  Hillary thus argues that the court should overlook this defect because defendants "were not prejudiced by [his] failure to include [the causes of action] in a notice of claim."  (Dkt. No. 62, Attach. 9 at 21.)

It is true that, pursuant to N.Y. Gen. Mun. Law § 50-e(6), a court may allow for a "mistake, omission, irregularity or defect made in good faith" to be "corrected, supplied, or disregarded . . . in the discretion of the court, provided it shall appear that the other party was not prejudiced thereby."

*Id.* "Section 50-e(6) 'merely permits correction of good faith, non-prejudicial, technical mistakes, defects or omissions, not substantive changes in the theory of liability.'" *Tyrrell v. Seaford Union Free Sch. Dist.*, 792 F. Supp. 2d 601, 637 (E.D.N.Y. 2011) (quoting *Mahase v. Manhattan & Bronx Surface Transit Operating Auth.*, 3 A.D.3d 410, 411 (1st Dep't 2004)).

Here, however, Hillary asks the court to forgive more than a mere good faith mistake or defect, and, instead, seeks permission to maintain entirely new causes of action, based, at least in part, on an entirely separate incident from when he was "detained" on "October 26, 2011." (Am. Compl. ¶¶ 76-85; Dkt. No. 60, Attach. 2 at 1.) In fact, it appears from Hillary's amended complaint that his assault and battery claim arises from the November 30, 2011 interaction with the police, which is nowhere indicated in his notice of claim. (Am. Compl. ¶ 77.) Accordingly, the court declines to exercise its discretion to permit a substantive amendment to the notice of claim at this late juncture, and these claims are dismissed. [10]

    *5.   Defamation*

---

[10] As the alleged assault and battery on November 30 is the only incident in which Daniels participated, (Defs.' SMF ¶ 41; Dkt. No. 60, Attach. 46 at 10), and this cause of action is dismissed, Daniels is therefore terminated from this action as a defendant.

In support of their motion for summary judgment on the defamation claim, defendants argue that Hillary has failed to both plead and prove the elements of the offense. (Dkt. No. 60, Attach. 46 at 23-27.) In response, Hillary simply asserts that questions of fact preclude the entry of summary judgment on his defamation claim. (Dkt. No. 62, Attach. 9 at 24.) The court agrees with defendants, and grants them summary judgment on this cause of action.

To state a claim for defamation under New York law, a plaintiff must allege "(1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993). "While the Second Circuit has abandoned the stringent *in haec verba* standard in defamation cases, to comply with the dictates of Rule 8(a) a plaintiff must still 'afford defendant sufficient notice of the communications complained of to enable him to defend himself.'"[11] *Simons v. New York*,

_____

[11] Defendants' argument that Hillary has failed to state a claim is premised on the more stringent pleading requirement of N.Y. C.P.L.R. § 3016(a), which requires that "the particular words complained of shall be set forth in the complaint." (Dkt. No. 60, Attach. 46 at 23-24.) Although Hillary has not addressed the proper pleading standard in his opposition memorandum, it appears that his defamation claim is brought pursuant to New York common law, and therefore, "while this court must apply the substantive law of New York to [his] defamation claim, . . . the pleading requirements for such a claim, set forth in C.P.L.R. § 3016(a), do not apply." *Nickerson v. Commc'n Workers of Am. Local 1171*, No. 504CV00875, 2005 WL 1331122, at *6 (N.D.N.Y. May 31, 2005) (citing *Erie R. Co. v.*

472 F. Supp. 2d 253, 267 (N.D.N.Y. 2007) (quoting *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986)), *aff'd sub nom. Simons v. Fitzgerald*, 287 F. App'x 924 (2d Cir. 2008).

In ruling on whether a complaint adequately alleges a claim for defamation, in compliance with Rule 8, "courts have considered whether said complaint references the alleged defamatory statement, identifies who made the statement, when it was made, the context in which it was made, whether it was made orally or in writing and whether it was made to a third party." *Nickerson v. Commc'n Workers of Am. Local 1171*, No. 504CV00875, 2005 WL 1331122, at *7 (citing *Sabatowski v. Fisher Price Toys*, 763 F. Supp. 705, 714 (W.D.N.Y. 1991); *see Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 289 (S.D.N.Y. 2006) (stating that, under Rule 8, "in order to properly plead a claim for defamation, a party must identify (1) the allegedly defamatory statements; (2) the person who made the statements; (3) the time when the statements were made; and, (4) the third parties to whom the statements were published," (internal quotation marks and citation omitted)).

---

*Tompkins*, 304 U.S. 64 (1938)); *but see Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 383 (N.D.N.Y. 2008) (applying the heightened pleading standard of C.P.L.R. § 3016 and requiring the plaintiff to "plead . . . the particular words giving rise to her [defamation] claim"). However, as explained herein, Hillary's claim fails under either pleading standard.

Here, Hillary's claim alleges that "[d]efendants . . . made untrue statements to a third party by implicating Hillary in the death of . . . Phillips." (Am. Compl. ¶ 88.)  The only factual allegation in the body of the complaint that speaks to this claim is that, at some point, "Potsdam [p]olice [o]fficers met with . . . Ian Fairlie, Hillary's assistant coach at Clarkson University, and identified Hillary as a suspect in the death of . . . Phillips."  (*Id.* ¶ 40.) Even under Rule 8's liberal pleading standards, Hillary's amended complaint fails to set forth the nature of the allegedly defamatory statements, or the context in which they were made, beyond vague and conclusory allegations that defendants "published false and unprivileged communications" that "implicat[ed] Hillary in the death of . . . Phillips" and "accused Hillary of a serious crime."  (*Id.* ¶¶ 87-88, 90.)

More tellingly, even if his claim were properly pleaded, it appears that the basis for the defamation claim is an alleged conversation that one or more defendants had with Fairlie, (Am. Compl. ¶ 40; Dkt. No. 60, Attach. 10 at 14), but Hillary points to no evidence in the record that would support his theory that defendants somehow defamed him to Fairlie.  (Dkt. No. 62, Attach. 9 at 24.)  On the contrary, defendants expressly deny making any such statements, (Dkt. No. 60, Attach. 37 ¶ 17; Dkt. No. 60, Attach. 38 ¶ 4;

Dkt. No. 60, Attach. 39 ¶ 3; Dkt. No. 60, Attach. 40 ¶ 19), and, in fact,

provide evidence, in the form of Fairlie's deposition testimony, that it was

members of the New York State Police, not the Potsdam police, who

identified Hillary as a suspect to Fairlie.  (Dkt. No. 60, Attach. 30 at 25-26,

34-37, 60-61.)  Fairlie affirmatively testified that he had no conversations

with anyone from the Potsdam Police Department or, more specifically,

with any of the defendants in this action.  (*Id.* at 65-66.)  Hillary's attempt to

save his claim from dismissal by raising new theories of liability for the first

time in opposition to defendants' summary judgment motion is unavailing.[12]

*See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010)

(stating that a district court "need not . . . consider[ claims] raised . . . for

the first time in opposition to summary judgment") (internal quotation marks

and citation omitted).  Defendants are therefore entitled to summary

judgment on the defamation cause of action.

     6.     *Intentional Infliction of Emotional Distress*

---

[12] In his response, Hillary points to his own testimony, which would appear to be inadmissible hearsay, that a local reporter "informed [Hillary] that the Potsdam Police implicated him in the murder," and his speculation, based on reports that Phillips' grandmother stated that she "sees the suspect in the village," that she must be referring to Hillary.  (Dkt. No. 62, Attach. 9 at 24.)  However, these incidents were neither alleged in the amended complaint, (*see generally* Am. Compl.), nor mentioned in Hillary's response or supplemental response to defendants' interrogatories when inquired as to the basis for his defamation claim, (Dkt. No. 60, Attach. 10; Dkt. No. 60, Attach. 11).  They also do not give the court any clearer picture of the nature of the allegedly defamatory statements made by defendants.

Defendants argue that Hillary's cause of action for intentional infliction of emotional distress (IIED) "must be dismissed as against the Village of Potsdam as a matter of public policy."[13] (Dkt. No. 60, Attach. 46 at 30.) As to the remaining defendants, they argue that the claim should be dismissed for failure to allege and demonstrate extreme and outrageous conduct, and because the conduct at issue is wholly encompassed by Hillary's other causes of action. (*Id.* at 30-33.) In response, Hillary argues, in conclusory fashion, that this claim should survive "since a jury could determine that [d]efendants acted outrageously outside the context of [his] other claims." (Dkt. No. 62, Attach. 9 at 25.) He asserts that the "flagrant violations" of his constitutional rights, and other "harass[ing]" behavior, constitute extreme and outrageous conduct, and therefore he is entitled to summary judgment. (Dkt. No. 59, Attach. 3 at 27-28.) The court agrees with defendants and grants them summary judgment on this claim.

Under New York law, "[t]he tort [of IIED] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a

---

[13] "'[I]t is well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity.'" *Rivera v. City of N.Y.*, 392 F. Supp. 2d 644, 657 (S.D.N.Y. 2005) (quoting *Lauer v. City of N.Y.*, 240 A.D.2d 543, 544 (2d Dep't 1997)). As Hillary has offered no opposition to this portion of defendants' argument, the IIED claim against the Village of Potsdam is dismissed.

substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993). As to the first element, "'the conduct [must have] been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting Restatement (Second) of Torts § 46 cmt. d (1977)).

Once again, as with his defamation cause of action, Hillary attempts to salvage his IIED claim by raising new allegations for the first time on summary judgment. As examples of extreme and outrageous conduct, Hillary now points to Potsdam police officers "follow[ing him] around town," defendants "conduct[ing] an investigation into [his] attorney," and "cit[ing his] significant other . . . for having a menacing dog even though [she] had this dog for over two years without complaints." (Dkt. No. 62, Attach. 9 at 25.) The court fails to see how any of this would constitute conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy*, 58 N.Y.2d at 303 (internal

quotation marks and citation omitted). In fact, the only one of these instances of alleged conduct that even involves Hillary, his being "followed around town," is attributed generally to "Potsdam police officers," and not to any of the named defendants in this action. (Dkt. No. 62, Attach. 9 at 25.) As to the others, there is no explanation or argument connecting the conduct to Hillary, or demonstrating any causal connection between the conduct and an injury to Hillary. *See Howell*, 81 N.Y.2d at 121.

Furthermore, as defendants argue, "[e]qually supportive of the dismissal of [Hillary]'s IIED claim is state case law barring IIED claims when 'a substantial portion of plaintiff's claim for the intentional infliction of emotional distress is based on the very same factual allegations in the [other] cause[s] of action.'" *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 383-84 (N.D.N.Y. 2008) (quoting *Stern v. Burkle*, No. 103916/07, 2008 WL 2420907, at *3 (N.Y. Sup. Ct. June 16, 2008)); *see Butler v. Delaware Otsego Corp.*, 203 A.D.2d 783, 784-85 (3d Dep't 1994) ("It is well settled that a cause of action for intentional infliction of emotional distress should not be entertained where the conduct complained of *falls well within* the ambit of other traditional tort liability." (internal quotation marks and citations omitted)). Here, Hillary's complaint explicitly alleges that

defendants "acted outrageously for their above-stated roles in the wrongful arrest and detainment," and "in the defaming of Hillary." (Am. Compl. ¶¶ 70, 72.) His interrogatory responses also failed to set forth any conduct, apart from that encompassed by his other causes of action, which could form the basis for an independent IIED claim. (Dkt. No. 60, Attach. 10 at 10.) Accordingly, summary judgment is granted to defendants on this claim, and it is dismissed.

### 7. *Punitive Damages*

Defendants seek to preclude Hillary from seeking punitive damages on the grounds that the Village is immune from punitive damages, and, with respect to the individual defendants, because "[n]one of the allegations made" by Hillary "rise anywhere near the level required for the imposition of punitive damages." (Dkt. No. 60, Attach. 46 at 27-28.) In response, Hillary merely repeats his allegations as to his substantive causes of action, and argues that these support a finding of "reckless or callous indifference to [his] federally protected rights." (Dkt. No. 62, Attach. 9 at 21-23.) He has provided no response to defendants' assertion that the Village, as a municipality, is immune from the imposition of punitive damages, and that portion of his request is therefore dismissed. *See Ciraolo v. City of N.Y.*,

216 F.3d 236, 239-40 (2d Cir. 2000) (noting that "'a municipality is immune from punitive damages under 42 U.S.C. § 1983'" (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). As to the individual defendants' liability for punitive damages, defendants have not provided a basis for dismissal at this juncture, other than stating in conclusory fashion that the conduct at issue does not justify punitive damages. (Dkt. No. 60, Attach. 46 at 27.) However, given the questions of fact discussed above, it would be inappropriate to decide the issue at this time. Summary judgment is therefore denied to both parties on the issue of punitive damages with respect to the individual defendants.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Hillary's motion for partial summary judgment (Dkt. No. 59) is **DENIED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 60) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **DENIED** with respect to Hillary's false imprisonment (Am.
> Compl. ¶¶ 55-62) and Fourth Amendment (*id.* ¶¶ 63-64a, 65)
> claims against the individual defendants in their individual

capacities and the Village of Potsdam, as well as his request for punitive damages against the individual defendants (*id.* ¶¶ 92-93); and

**GRANTED** in all other respects, and Hillary's remaining claims are **DISMISSED**; and it is further

ORDERED that the Clerk terminate Daniels as a defendant in this action; and it is further

ORDERED that Hillary's motions to unseal (Dkt. Nos. 66, 69, 73) are **DENIED**; and it is further

ORDERED that this case is trial ready and the Clerk shall issue a trial scheduling order in due course; and it is further

ORDERED that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 3, 2015
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court